THOMAS J. MURPHY, Individually and as Executive Director of the Illinois Liquor Control Commission, Plaintiff-Appellee, *v.* PHILIP W. COLLINS, Individually and as Chairman of the House of Representatives Executive Committee's, Subcommittee, Defendant-Appellant.

(No. 59362;

First District (4th Division)—May 8, 1974.

William J. Scott, Attorney General, of Chicago (Fred F. Herzog, Paul J. Bargiel, and Charles Bernardini, Assistant Attorneys General, of counsel), for appellant.

Foran, Wiss and Schultz, of Chicago (Thomas A. Foran, Robert E. Wiss, and Ian H. Levin, of counsel), for appellee.

Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:

The plaintiff-appellee was subpoenaed to appear and testify before a subcommittee of the Executive Committee of the Illinois House of Representatives. The defendant-appellant was the Chairman of the subcommittee and the subpoena was signed by him. The plaintiff brought an action seeking a declaratory judgment and injunctive relief on the ground that the defendant had no authority to subpoena him because the subcommittee was improperly created. The trial court issued a permanent injunction enjoining the defendant from conducting further hearings of the subcommittee. The trial court held that the subcommittee was created in a manner inconsistent with the rules of the House of

Representatives of the 78th General Assembly and therefore could not conduct hearings and issue subpoenas. The defendant has appealed and raises numerous issues for review.

On June 6, 1973, W. Robert Blair, Speaker of the Illinois House of Representatives, wrote a letter to the defendant who was the Chairman of the House of Representatives' Executive Committee which is a standing committee of the House. The letter referred to a series of events involving Lawrence E. Johnson, the Governor's appointee as Chairman of the Illinois Liquor Control Commission, and the withdrawal of his name on the eve of the Senate Confirmation. The letter directed the defendant "to appoint and head a fact finding subcommittee of the House Executive Committee to investigate this matter." The letter stated:

"The charge of the subcommittee should include, but not be limited to, determining whether or not there has been an intentional, willful violation of the operational independence of the Liquor Control Commission by one or more individuals within the Executive branch. If the subcommittee determines that such violations have occurred, or that there is a clear potentiality for such a condition, then you should be prepared to propose remedial legislation to the General Assembly to correct the situation."

On the same date the defendant appointed the subcommittee as directed and named himself as Chairman.

The subcommittee held initial hearings on June 11 and 18, 1973, and two members of the subcommittee, Representatives Harold Washington and John Matijevich, challenged the legal status of the subcommittee. The power and authority of the Speaker of the House to direct the creation of the subcommittee was challenged. The two Representatives also questioned the power of a subcommittee to issue subpoenas.

On July 5, 1973, the plaintiff who was the Executive Director of the Illinois Liquor Control Commission was subpoenaed to appear and testify before the subcommittee on July 10, 1973. The subpoena commanded the plaintiff to testify, "Concerning all things of which [he] may have knowledge concerning the operational independence of the Illinois Liquor Control Commission in general, and specifically, the circumstances surrounding the withdrawal of the nomination of Lawrence Johnson as Chairman of the Illinois Liquor Control Commission." The subpoena also stated that if plaintiff failed to appear he was subject to legal action for enforcement of the subpoena. Attached to the subpoena was a copy of the pertinent portions of the Illinois Revised Statutes concerning the neglect or refusal to appear before either house of the General Assembly, or any committee thereof, or a joint committee of both houses. (Ill. Rev. Stat. 1971, ch. 63, par. 7 and par. 8.) These sec-

tions proscribe that a person who fails to appear may be arrested and compelled to give testimony and he shall be guilty of a petty offense.

On July 9, 1973, the plaintiff instituted his action seeking declaratory and injunctive relief. At the same time a motion for a temporary restraining order was filed and on July 11, 1973, the trial court granted the temporary restraining order. The defendant filed a special and limited appearance for the sole purpose of contesting jurisdiction and on July 16, 1973, filed a motion to quash service and return of summons. Oral argument on the motion to quash was had on July 18, 1973.

At the hearing on the motion to quash, the defendant filed three affidavits. One was by Fredric B. Selcke, the Clerk of the Illinois House of Representatives, in which Mr. Selcke stated:

> "I know of my own knowledge that chairmen of house committees have appointed subcommittees with investigative powers on numerous occasions in the past, without any resolution to that effect by the House of Representatives."

The affidavit of Ann Lousin, the Parliamentarian of the Illinois House of Representatives, was also presented. She stated that she had observed committee chairmen customarily create subcommittees without a resolution being passed by the House and that such subcommittees operate and function as a normal and accepted part of the legislative process. The affidavit of Noretta Lorene Sponsky, the Supervisor of Committee Clerks of the House, was also introduced at the hearing. In her affidavit she stated:

> "* * * It has been and is the practice in standing committees of the Illinois House of Representatives that Chairman appoint subcommittees to consider such matters as bills and resolutions, election contests, and investigations into various matters of legislative concern."

She also stated that the chairman of a standing committee appoints members to a subcommittee at his discretion subject to being overridden in his actions by the full committee. The affidavit also contained the statement that in the 78th General Assembly there were numerous subcommittees created by chairmen of standing committees and that they were engaged in the study of various matters of legislative concern. The plaintiff also introduced an affidavit by Frederic B. Selcke, the Clerk of the Illinois House of Representatives. In this affidavit Mr. Selcke stated that he had found no resolution of any kind adopted by the House of Representatives creating an investigative subcommittee with power to investigate the Illinois Liquor Control Commission. He also stated that there was no resolution creating any special committee to conduct such an investigation or granting the Executive Committee of the House the

power to create a subcommittee with power to investigate the Illinois Liquor Control Commission.[1]

The trial court denied the defendant's motion to quash service and return of summons but allowed the defendant to have the motion considered as a motion to dismiss the complaint. After further argument, the trial court denied the defendant's motion to dismiss the complaint and the defendant elected to stand on his motion in lieu of filing an answer. On July 20, 1973, the trial court issued an order granting a permanent injunction. The trial court found that the subcommittee created pursuant to the directions contained in the Speaker of the House of Representatives' letter was not legally constituted and that the purported subcommittee did not have the power to issue subpoenas. The injunction permanently restrained the defendant from conducting further hearings of the subcommittee. The order of the trial court also excused compliance with the subpoena issued to the plaintiff and quashed the subpoena.

The first issue raised by the defendant is that the plaintiff lacks standing to sue. This contention is based on the assertion that the plaintiff could not institute an action for a declaratory judgment and an injunction on the ground that the subcommittee was improperly constituted and therefore, the subpoena was unlawfully issued when the complaint did not allege any harm suffered by the plaintiff and the suit was commenced before the plaintiff even appeared before the committee. The

---

[1] In his brief the plaintiff stated that on approximately June 12, 1973, House Resolution 409 was introduced before the Illinois House of Representatives and called for the creation of a special committee to investigate the Illinois Liquor Control Commission and the events related to the dismissal of Lawrence E. Johnson as Chairman of that commission. Plaintiff stated, "This resolution was *not* adopted by the House of Representatives." In his reply brief the defendant stated that the sponsors of the resolution employed a parliamentary procedure "to have the Rules of the House suspended, which normally would provide for the assignment of the resolution to the appropriate committee for study, in this instance the Executive Committee." The defendant further stated, "The House merely refused to suspend the Rules, but did not vote down an investigation of the Illinois Liquor Control Commission * * *". The 1973 Final Legislative Synoposis and Digest of the 1973 Session of the 78th General Assembly, State of Illinois (No. 23, Vol. II, at 775) in regards to H.R.-409 states:
"June 12. Offered. Speaker's table.
June 19. Committee on Assignment of Bills. Executive Committee.
Oct. 22. Returned by Committee. Tabled by Rule."
Whatever parliamentary procedures were utilized, suffice it to say that when the 78th General Assembly recessed on June 30, 1973, as evidenced by Mr. Selcke's affidavit, there was no resolution adopted by the House creating an investigative subcommittee nor a resolution creating a special committee or granting the Executive Committee the power to create a subcommittee to investigate the Illinois Liquor Control Commission.

plaintiff maintained that he had standing to sue because a hearing by a legislative body that totally lacks jurisdiction violates the constitutional provisions relating to due process of law. We are of the opinion that the plaintiff did possess the necessary standing to challenge the legal authority of the subcommittee and its power to issue a subpoena to him.

■■ We commence an analysis of this issue from the position that "standing to sue" is an amorphous concept and not susceptible of a ready definition. However, prior judicial decisions supply much guidance in this area and perhaps the most illuminating statements as to what is meant by "standing to sue" can be found in the United States Supreme Court decision of *Flast v. Cohen*, 392 U.S. 83, 20 L.Ed. 2, 947, 88 S.Ct. 1942, 1968. As the Supreme Court delineated in *Flast*, the salient aspect of standing is its focus on the party seeking an adjudication and not the issue he desires to have adjudicated.

> "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' *Baker v. Carr*, 369 U.S. 186, 204 (1962). In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." (*Flast, supra,* at 99 to 100; *accord, Sierra Club v. Morton*, 405 U.S. 727 at 732, 31 L.Ed.2d 636 at 641, 92 S.Ct. 1361 at 1364 (1972).)

The Supreme Court went on to say:

> "We have noted that, in deciding the question of standing, it is not relevant that the substantive issues in the litigation might be nonjusticiable. However, our decisions establish that, in ruling on standing, it is both appropriate and necessary to look to the substantive issues for another purpose, namely, to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." (*Flast, supra,* at 101 to 102.)

When we follow the analysis as outlined in *Flast*, it cannot be denied that the plaintiff had standing to sue.

■■ The status asserted by the plaintiff in the case at bar was that of a citizen of the State of Illinois, endowed with all of the protections afforded to citizens under the United States and Illinois Constitutions, who was subpoenaed to appear and testify before a purported subcommittee of the House of Representatives. The claim sought to be adjudicated was whether the subcommittee of the Executive Committee was legally constituted and whether it had the power to issue a subpoena

to the plaintiff. The substantive issues in the case at bar necessarily involve the concept of due process of law. The fundamental requirements of due process are notice and an opportunity to be heard or to defend.

> "Due process of law implies the administration of equal laws according to established rules, not violative of the fundamental principles of private right, *by a competent tribunal having jurisdiction of the case* and proceeding upon notice and hearing. (McGehee on Due Process of Law, p. I.)" (*People v. Niesman,* 356 Ill. 322, at 325, 190 N.E. 668 at 669 to 670 (1934)) (Emphasis added.)

The principles of due process are not applicable only to court proceedings but as stated in *People v. Scott,* 326 Ill. 327 at 353, 157 N.E. 247 at 258 (1927):

> "The terms 'law of the land' and 'due process of law' are synonymous, and extend to every proceeding which may deprive a person of liberty or property, whether the process be judicial or administrative or executive in its nature. (*People v. Strassheim,* 242 Ill. 359.)" Overruled on other grounds, *People ex rel. Noren v. Dempsey,* 10 Ill.2d 288 at 294 (1957).

The proceedings involved in the case at bar definitely threatened the plaintiff with a deprivation of his liberty and therefore, the principles of due process of law were applicable. The purported subcommittee seeking to require the plaintiff's testimony must be competent and have jurisdiction to comply with the principles of due process. The plaintiff brought an action questioning the competency and jurisdiction of the purported subcommittee and it is the opinion of this court that a logical nexus exists between the plaintiff's status and the claim sought to be adjudicated. When attention is focused on the plaintiff, it is evident that he has alleged such a personal stake in the outcome of the controversy that the concrete adverseness that is required is assured.

In asserting that the plaintiff lacked standing to sue, the defendant maintains that the plaintiff's complaint did not state that the plaintiff's constitutional or other rights were interfered with or infringed upon. Defendant also maintains that there was no averment that the plaintiff has been or would be unable to raise his claim of the subcommittee's supposed illegality before the subcommittee itself or the Executive Committee. These points are made to support the defendant's contention that none of the plaintiff's rights were invaded and thus he had no standing to sue. We do not find these attacks on the plaintiff's complaint persuasive and they do not alter our judgment that the plaintiff had standing to sue.

The Illinois Civil Practice Act provides that a liberal construction shall be given to pleadings and that "[n]o pleading is bad in substance which contains such information as reasonably informs the opposite party of the nature of the claim or defense which he is called upon to meet." (Ill. Rev. Stat. 1971, ch. 110, pars. 33(3) and 42(2).) As stated in *Irving v. Rodriquez,* 27 Ill.App.2d 75, at 81, 169 N.E.2d 145 at 147 (1960):

> "The essential test of a complaint is that it has informed the the defendant of a valid claim under a general class of cases of which the court has jurisdiction as distinguished from a complaint that states no cause of action at all." (Citations.)

While we agree with the defendant that there was no specific allegation in the plaintiff's complaint that his constitutional rights were being threatened with infringement, a reading of the complaint in its entirety, reveals that it contained such information as to reasonably inform the defendant of the claim which he was called upon to meet.

The sixth paragraph of the complaint stated that there was no resolution passed by the House of Representatives creating a subcommittee of the Executive Committee nor setting forth the powers and nature of an investigation to be made by such a subcommittee and the rights of witnesses testifying before the subcommittee. The eighth and ninth paragraphs of the complaint alleged that the rules of the Illinois House of Representatives did not give the Speaker of the House nor the Chairman of the Executive Committee the power to create a subcommittee of the Executive Committee for the purpose of conducting an investigation. In the tenth paragraph the plaintiff alleged that the rules of the House did not provide that a subcommittee of the Executive Committee could compel witnesses to appear and testify before the subcommittee. The final paragraph of the complaint alleged that the said subcommittee was not legally constituted and had no power to issue a subpoena to the plaintiff.

> "In deciding whether plaintiff has stated facts sufficient to allege a cause of action, the court must look to the plain and fair intendment of the language used by plaintiff and the facts which may be reasonably implied from such language." (*Annerino v. Dell Publishing Co.,* 17 Ill.App.2d 205 at 210, 149 N.E.2d 761 at 763 (1958).)

When the complaint in the case at bar is read in the light of all the foregoing principles of law, it is clear that the fair intendment of the language utilized by the plaintiff was that any proceeding by the purported subcommittee of the House Executive Committee in which he

was compelled to testify would violate plaintiff's constitutional right to due process of law. Therefore, contrary to the defendant's contention the plaintiff's complaint did allege a threatened deprivation of a constitutional right.

The defendant's contention in regards to the lack of an averment that the plaintiff could have gone before the subcommittee or the full Executive Committee to raise the alleged illegality of the subcommittee is equally unpersuasive as to the standing issue. The plaintiff had been subpoenaed to appear and testify before a purported subcommittee of the Executive Committee of the House of Representatives and he questioned the legal authority and power of the purported subcommittee. Once the plaintiff was served with the subpoena he had a choice of either complying or not complying with it. If he chose the latter course of action he ran the risk of subjecting himself to the sanctions contained in Illinois law. (See Ill. Rev. Stat. 1971, ch. 63, par. 7 and par. 8.) It would be untenable to hold that a person faced with such a choice must first appear before the very subcommittee whose legal authority and power he questioned or the full Executive Committee[2] of which the subcommittee was an integral part and raise the issue of the legality of the creation of the subcommittee. The plaintiff was alleging that his constitutional right of due process of law was being threatened with infringement and the proper forum to determine if the subpoenaing body had the legal authority and power to compel the plaintiff to appear and testify was a court of competent jurisdiction.

It should be noted that the defendant makes two other unpersuasive points in his assertion that the plaintiff lacked standing to sue. The defendant maintains that the trial court's finding that the plaintiff would suffer irreparable injury if relief is not granted is gratuitous and that the finding that the plaintiff had no remedy at law is untenable. There would have been irreparable injury to the plaintiff if he had been required to appear and testify before a subcommittee that was illegally constituted and lacked jurisdiction. The defendant also maintains the plaintiff had an adequate remedy at law and stated, "that finding [that plaintiff had no adequate remedy at law] ignores the obvious and well recognized remedy of appeal to the entire committee from the ruling or action of the committee chairman." The defendant cited as authority for this

---

[2] The defendant never explains how a person in the plaintiff's position could convene the full Executive Committee of the House of Representatives for this purpose. As far as this court can ascertain, the rules of the Illinois House of Representatives do not provide a procedure for a subpoenaed witness to follow in this regard.

proposition the affidavit of Noretta Lorene Sponsky, the Supervisor of the Committee Clerks of the Illinois House of Representatives. In her affidavit she stated:

> "＊  ＊  ＊  The practice in regards to creating and appointing the subcommittee has been that the Chairman of the standing committee creates the subcommittee and appoints the members at his discretion, pursuant to his generally-recognized authority to manage the affairs of his committee, subject, of course, to being overridden in his actions by the full committee."

With all due respect to the affiant this can hardly be considered persuasive authority for the proposition that an adequate remedy at law existed. As previously alluded to, the defendant did not explain how a party in the plaintiff's position could convene the full Executive Committee to contest the legal authority and power of the subcommittee nor can this court find any provision in the rules of the House of Representatives providing for such a procedure. The finding of the trial court that no remedy at law existed was correct and what is untenable is the contrary position of the defendant.

The next contention of the defendant is that the case at bar does not present a justiciable issue. The defendant stated in his brief:

> "Since plaintiff,  ＊  ＊  ＊  has not alleged any harm which has befallen him through the existence and operation of the subcommittee and has not even appeared and raised his claim before the committee, there is in fact at this posture of the case no actual controversy before the Court."

Therefore, the defendant contends that the plaintiff was seeking an advisory opinion as to whether or not the subcommittee was lawfully constituted and states that such an opinion may not be rendered. We have previously refuted the defendant's contention that the plaintiff's complaint failed to allege any actionable harm and that it was first necessary to appear before the purported subcommittee or the full Executive Committee. It is our opinion that the plaintiff was not seeking an advisory opinion and that a justiciable issue was presented to the trial court.

In support of his position the defendant has cited four cases from the Federal Courts, *Mins v. McCarthy,* 209 F.2d 307 (1953); *Pauling v. Eastland,* 288 F.2d 126 (1960); *Ansara v. Eastland,* 442 F.2d 751 (1971); and *Cole v. Trustees of Columbia University,* 300 F. Supp. 1026 (1969). However, each one of these cases can be distinguished from the case at bar.

In *Mins* a subpoena to testify had been issued to the plaintiff but it did not define what questions were to be asked. The plaintiff sought

to stay the hearing and the court held in a per curiam opinion that the judiciary should not enjoin in advance the holding of the hearing or suspend the subpoena. The rationale for the court's holding was that the rights of a witness as to any question propounded at the hearing could be determined in appropriate proceedings thereafter. The salient difference between *Mins* and the case at bar is that in *Mins* the plaintiff did not question the legal authority and power of the committee.

In *Pauling* the plaintiff had participated in the preparation of a petition addressed to the United Nations which urged an international agreement for the cessation of the testing of nuclear weapons. The subcommittee on Internal Security of the United States Senate began an inquiry into the matter. A directive was issued to the plaintiff requiring him to bring before the subcommittee all signatures to the petition and the letters by which the signatures had been transmitted to the plaintiff. The plaintiff filed suit seeking a declaratory judgment declaring the directive void and enjoining its enforcement and a possible prosecution for failure to comply. The United States Court of Appeals for the District of Columbia affirmed the district court's dismissal of the complaint on the grounds that the court lacked jurisdiction and that the doctrine of the separation of powers was applicable. The court stated:

> "Judicial authority arises upon the happening of an event or the existence of a fact, or *sometimes the threat of an event or a fact*. It does not come into being *in vacuo*." (*Pauling, supra* at 128.) (Emphasis added.)

The court went on to say:

> "The courts have no power of interference, unless and until some event, such as arrest, indictment or conviction, brings an actual controversy into the sphere of judicial authority. The courts cannot interfere merely upon the petition of a person potentially liable to some such event." (*Pauling, supra*, at 129.)

The distinction between *Pauling* and the case at bar is readily apparent. The plaintiff in *Pauling* was seeking to have the directive declared void and not that the subcommittee was illegally constituted or that it lacked the power to issue the directive. The court made specific reference to the fact that no detention had yet occurred nor had Pauling been cited for contempt. Under these circumstances no actual controversy existed. Unlike the situation in *Pauling*, the facts existing in the case at bar, the threatened deprivation of the plaintiff's constitutional rights, bring the dispute into the ambit of judicial power and present an actual controversy and justiciable issue.

The *Ansara* case is also distinguishable on the same basis as *Mins* and *Pauling*. The plaintiffs in *Ansara* made no allegation that the subcommit-

tee on Internal Security of the Senate Judiciary Committee which had issued subpoenas *duces tecum* to them lacked legal authority or power. The question of the competency and jurisdiction of the subcommittee was not presented to the court.

The *Cole* case is also distinguishable. In *Cole*, the plaintiffs were the Students for a Democratic Society, Columbia University Chapter. They brought a motion seeking to restrain the Trustees of Columbia University from complying with a subpoena *duces tecum* served upon the Trustees by the Permanent Subcommittee on Investigations of the Committee on Government Operations of the United States Senate. The underlying suit sought a declaratory judgment to have the subpoena *duces tecum* served upon Columbia University declared unconstitutional and void. In other words, what the plaintiffs in *Cole* were attempting to do was quash a subpoena that had been issued to another party. The court declined to grant the plaintiffs' motion and dismissed the complaint. Specific reference was made to the fact that the Senate of the 91st Congress had passed a resolution authorizing the Committee on Government Operations or any subcommittee thereof to make the specific investigation to which the subpoena was directed. The court also noted that the Legislative Reorganization Act of 1946 gave each standing committee of the Senate and any subcommittee of such committee the power to subpoena witnesses and books, papers and documents. In denying the plaintiffs' request for relief the court stated at 1029 to 1030:

> "It is apparent from the present posture of this case that the parties presently seeking the injunction are neither threatened by a taking of property belonging to them nor with any infliction of punishment, such as a Congressional citation for contempt. This Court will not attempt to protect the plaintiffs from a danger yet unknown." ( Citations omitted. )

The plaintiff in the case at bar was not seeking relief from a danger yet unknown but from the imminent threat of a violation of his constitutional right to due process of law. His position was clearly distinguishable from that of the plaintiffs in *Cole*.

In his reply brief the defendant added an alternative contention to his primary position that the case at bar was not justiciable due to the plaintiff's failure to allege any actionable harm. The defendant maintains in the alternative that even if actionable harm was alleged the case is still not justiciable because the plaintiff in his capacity as a public employee had a duty to appear before the subcommittee and raise his objections. We have already dealt with and refuted a similar contention in regards to the standing issue and we find this contention no more

persuasive in regards to justiciability. The defendant cited *United States v. Bryan*, 339 U.S. 323, 94 L. Ed. 884, 70 S. Ct. 724 (1950), in support of his alternative position. A perusal of that opinion reveals it is not applicable and is not authority for the proposition cited. In *Bryan* the respondent had been found guilty of a wilful default in failing to comply with a subpoena *duces tecum* which had been issued by the House of Representatives Committee on Un-American Activities. The respondent had defended on the ground, *inter alia*, that a quorum of the committee was not present when she was required to comply with the subpoena and therefore, she was not guilty of wilful default. The Supreme Court assumed without deciding that subpoenas refer to production of papers before the committee *qua* committee and agreed that the respondent could rightfully demand a quorum be present. However, the court characterized the respondent's defense as an inability to comply with the subpoena and held that a witness who seeks to excuse a default on the ground of inability to comply must first go before the committee in order to allow it an opportunity to consider or remedy the objection. The respondent in *Bryan* was not questioning the legal authority and power of the Committee as the plaintiff in the case at bar does. The Supreme Court did not hold that a plaintiff in a position such as that of the plaintiff in the instant case must first go before the very subcommittee of which he questions its competency and jurisdiction and raise his objection. As we previously stated, we find imposing such a requirement would be untenable.

This court realizes that justiciability is at least as difficult a concept to define as "standing to sue". However, when a plaintiff comes before a court of law and alleges that his constitutional right of due process of law is threatened with imminent violation, we are of the opinion that an actual controversy and justiciable issue are presented. We, therefore, find no merit in the defendants' contrary position.

The defendant also contends that the order of the trial court violates the doctrine of the separation of governmental powers. The defendant maintains that the injunction issued by the trial court exceeded its jurisdictional powers and infringed upon the power of the legislative branch of government. The theory of the defendant is that the trial court's determining whether a legislative subcommittee and a legislator have validly proceeded under the rules of the House of Representatives constitutes an interference by the judiciary with the legislative powers and privileges. While we cannot argue with the defendant that the governmental power of the State of Illinois is divided between three separate but equal branches of government and that no branch can exercise the

powers that properly belong to another (*see* Ill. Const. 1970, art. II, § 1), we do not agree that the order of the trial court does violence to the doctrine of separation of powers.

An illuminating disposition of the relationship of the judiciary to the legislative and executive branches of government can be found in the opinion of our own supreme court in *People ex rel. Billings v. Bissell,* 19 Ill. 229 (1857). The Supreme Court characterized and delineated the power of the judiciary in regards to the legislative and executive branches of government.

> "* * * [T]he judicial department of the government exercises a certain controlling, or rather restraining, power, over both the other departments of the government. * * * [W]hen carefully considered, it will be seen that each department, within its proper constitutional sphere, acts independently of both the others, and restraint is only placed upon it when such sphere is actually transcended, * * *. As from necessity and the very nature of all government, there must be an ultimatum somewhere, whose duty it is to determine whether such sphere has been passed or not; that duty, in most cases, falls on the judicial department, from the fact that in this department is reposed the responsibility of enforcing or giving effect to the acts of the other departments. * * * We may not enjoin the others from doing an unconstitutional act, but by refusing to give effect to such act, or relieving against it, when properly and judicially applied to for that purpose, we may restrain them." (*People ex rel. Billings v. Bissell, supra,* at 231 to 232.)

The judiciary cannot legislate nor can it enjoin the legislature from doing so but the courts can restrain the legislative branch of government from acting in an unconstitutional manner.

> "Under the fundamental principle of the constitution separating the powers of government into those which are legislative, executive or judicial in character, the courts do not exercise legislative power nor interfere with, revise or set aside legislative acts within the scope of the legislative power. They have no right to inquire into the motives of the legislative body nor into the wisdom or expediency of the legislative act, but *it is their duty to interpret laws and protect the rights of individuals against acts beyond the scope of legislative power.*" (*People ex rel. Huempfrer v. Benson,* 294 Ill. 236 at 239, 128 N.E. 387 at 388, 1920.) (Emphasis added.)

Our supreme court also stated in *Donovan v. Holzman,* 8 Ill.2d 87 at 93, 132 N.E.2d 501 at 506 (1956):

> "While we cannot exercise legislative powers or compel their

proper action, the judiciary has always had the right and duty to review all legislative acts in the light of the provisions and limitations of our basic charter."

■■■ When the doctrine of separation of powers is viewed properly, it becomes clear that the order and injunction of the trial court in the case at bar did not constitute an usurpation of, or infringement upon the powers and privileges of the legislative branch of government. The plaintiff in the instant controversy was seeking an adjudication as to whether a subcommittee of the Executive Committee of the House of Representatives was legally constituted and if it had the power to issue him a subpoena. The order and injunction of the trial court did not infringe upon or interfere with the powers and privileges of the legislative branch of government but rather restrained an integral part of the legislative branch, an investigating subcommittee, from proceeding in a manner that would violate the constitutional rights of a citizen of Illinois. This was a proper role for the judicial branch of government to assume and merely constituted a restraint on the legislative branch and a prohibition against it exceeding its sphere of authority. As we previously stated, the courts have a duty to protect individuals from actions by the legislative branch of government that exceed its scope of authority. The order and injunction of the trial court was an exercise of that duty and did not violate the doctrine of the separation of powers.

The defendant cited numerous cases to support his position on this issue, but none are persuasive. Rather than make a detailed analysis of all the cases cited, we will only comment briefly on the case most heavily relied upon by the defendant, *Fletcher v. City of Paris*, 377 Ill. 89, 35 N.E.2d 329 (1941). The plaintiff in *Fletcher* sought to enjoin the city from holding an election and the court affirmed a decree of the trial court dismissing the plaintiff's complaint. The election involved was one that was necessary to pass and enact a municipal ordinance. The court stated:

> "By the constitution, the powers of government are divided between three distinct branches of the government created by that instrument. The judiciary has no supervision over the legislative branch of the government. The courts can neither dictate nor enjoin the passage of legislation." (*Fletcher, supra,* at 96.)

The thrust of *Fletcher* is that the judiciary cannot enjoin the legislative branch of government from enacting legislation. This proposition cannot be controverted and we readily agree with it. However, neither the *Fletcher* decision, nor any of the other cases cited by the defendant are authority for the proposition that the judiciary violates the doctrine of the separation of powers by restraining the legislative branch from act-

ing in a manner that would violate the constitutional rights of an individual. It is the duty of the courts to prevent such actions and this is all that the trial court's order and injunction did in the case at bar.

The defendant also maintains that the trial court lacked jurisdiction because the plaintiff sought adjudication of a political question. The Declaratory Judgment Act of Illinois (Ill. Rev. Stat. 1971, ch. 110, par. 57.1) does not permit a court to render declaratory relief when a political question is involved. The pertinent portion of the statute reads:

"In no event shall the court entertain any action or proceeding for a declaratory judgment, decree or order involving any political question where the defendant is a State officer whose election is provided for by the Constitution; * * *."

We agree that the defendant falls within the description of a State officer whose election is provided for by the constitution. However, the salient point of inquiry must be whether the plaintiff's complaint brought forth a political question for which no declaratory relief can be granted. We are of the opinion that no nonjusticiable political question was presented.

It is important to note that the defendant has treated the concept of a political question as separate and apart from the doctrine of the separation of powers. However, the two concepts are inextricably related. As was stated in *Baker v. Carr*, 369 U.S. 186 at 210, 7 L. Ed. 2d 663 at 682, 82 S. Ct. 691 at 706 (1962): "The nonjusticiability of a political question is primarily a function of the separation of powers." It is through the concept of a political question that the doctrine of the separation of governmental powers is given effect. The political question doctrine is a means by which governmental order is preserved. The label "political question" is placed, when appropriate, on those issues presented to the judiciary for adjudication which would necessitate the court to proceed in a manner that would violate the doctrine of separation of powers. As previously stated, the trial court's order and injunction did not violate the doctrine of separation of powers and similarly, this case does not present a nonjusticiable political question.

■■ The attributes of a political question were most succinctly and definitively set forth in the United States Supreme Court decision of *Baker v. Carr, supra.*[3] The Supreme Court stated at page 217:

---

[3] The defendant cited the case of *Board of Education v. Board of Education*, 11 Ill.App.2d 408 (1956), as providing a definition of a political question. However, a perusal of that opinion reveals that it did not touch upon the issue of what constitutes a political question but rather made a distinction between political rights and civil rights. The court defined political rights as the power to participate in the establishment and management of the government. The court held that the plaintiff was seeking to enforce his political rights and that a court of equity did not have jurisdiction in such a case. The case does not provide a definition of a political question and is inapposite to the political question issue in the case at bar.

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarassment from multifarious pronouncements by various departments on one question."

We find that none of the attributes outlined above are present in the case at bar. The only one remotely discernible is "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government." However, we are of the opinion that a determination by a court that if an integral part of the legislative branch of government is permitted to proceed in a particular manner the result will be a deprivation of a constitutional right of an individual, does not constitute a lack of respect due a coordinate branch of the government, but it is an exercise of one of the duties committed to the judiciary. As stated in *Stamler v. Willis*, 415 F. 2d 1365 at 1369 to 1370 (1969):

"We conclude that plaintiffs' claims should be considered on the merits even though a coordinate branch of the Government is involved. The judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government."

The issue presented in the case at bar was one concerning the consistency of the actions of certain elected representatives with the constitutional rights of a citizen of Illinois. The instant controversy does not present any of the attributes of a political question and therefore, the proscription in the Civil Practice Act against rendering declaratory relief when a political question is involved is not applicable. We find the defendant's contention to the contrary without merit.

The defendant's next contentions are that standing committees of the Illinois House of Representatives can conduct investigations on their own initiative and that the State Constitution authorizes investigatory activities by legislative committees. These contentions are raised in an

attempt to refute the trial court's finding "that a standing committee of the House of Representatives has no power, absent a Resolution of the House of Representatives, to conduct an investigation of a subject not related to a proposed bill or resolution before it for consideration." The thrust of the defendant's argument is that standing committees of the House of Representatives possess investigative powers within the purview of their legislative realm, regardless of whether any bill or resolution is pending before them. We do not agree.

The defendant maintains that the power to conduct legislative investigations is a necessary and inherent adjunct to the power to legislate and has cited numerous cases to support this position. (See *McGrain v. Dougherty*, 273 U.S. 135, 71 L. Ed. 580, 47 S.Ct. 319 (1927); *Watkins v. United States*, 354 U.S. 178, 1 L. Ed. 2d 1273, 77 S.Ct. 1173 (1957); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 9 L.Ed.2d 929, 83 S.Ct. 889 (1963); *Barrenblatt v. United States*, 360 U.S. 109, 3 L.Ed.2d 1115, 79 S.Ct. 1081 (1959); *Uphaus v. Wyman*, 360 U.S. 72, 3 L.Ed.2d 1090, 79 S.Ct. 1040 (1959); *Liveright v. Joint Committee of the General Assembly*, 279 F. Supp. 205 (1968); *Asp, Inc. v. Capital Bank & Trust Co.*, 174 So. 2d 809 (1965); *Greenfield v. Russel*, 292 Ill. 392, 127 N.E. 102 (1920) and *Du Bois v. Gibbons*, 2 Ill.2d 392, 118 N.E. 2d 295 (1954).) It cannot be denied that legislative bodies necessarily have the authority and power to conduct legislative investigations in order to acquire the expertise that is needed to legislate knowledgeably and effectively. This inherent power in a *legislative body* was recognized by the United States Supreme Court in *McGrain v. Dougherty, supra*, at 161:

"But there is no provision expressly investing either house with power to make investigations and exact testimony to the end that it may exercise its legislative function advisedly and effectively. So the question arises whether this power is so far incidental to the legislative function as to be implied.

In actual legislative practice power to secure needed information by such means has long been treated as an attribute of the power to legislate. It was so regarded in the British Parliament and in the Colonial legislatures before the American Revolution; and a like view has prevailed and been carried into effect in both houses of Congress and in most of the state legislatures."

This necessary attribute of the power to legislate has also been found to exist in the Illinois General Assembly. In *Greenfield v. Russel, supra*, at 400, our supreme court stated:

"It must also be conceded that a State legislature has power to obtain information upon any subject upon which it has power to

legislate, with a view to its enlightenment and guidance. This is essential to the performance of its legislative functions, and it has long been exercised without question. (*Ex parte Parker*, (S.C.) 7 Ann. Cas. 874, and note.)"

While we agree that the Illinois General Assembly possesses the inherent authority and power to conduct legislative investigations, this does not mean that the standing committees of the Illinois House of Representatives can conduct such investigations on their own initiative. It is in this respect that the position of the defendant is erroneous and the issue was succinctly framed by the trial court when it stated, "the crucial question is what is the power of the House Executive Committee?"

This court is of the opinion that the inherent authority and power to conduct legislative investigations is possessed by the *General Assembly* (the Senate and House of Representatives respectively) and while we recognize that the work of the General Assembly must necessarily be carried out through committees, there must be a transmittal through some appropriate means of this inherent authority and power to the committee system. In other words, the committee system as a creature of the legislative body must look to its parent for its authority and power. In this regard it is important to note that in each of the cases cited above by the defendant, there existed a specific authorization from the legislative body to the committee or subcommittee thereof to conduct the particular investigation. As stated in *Fergus v. Russel*, 270 Ill. 304 at 344, 110 N.E. 130 at 146 (1915):

> "During the sessions of the legislature either house may appoint separate committees, and the two houses, acting concurrently, may appoint joint committees for any proper purpose, which may exercise such powers as the house or houses appointing them may lawfully delegate or impose. The only powers which can be conferred upon and delegated to such committees are such powers as are possessed by the house or houses making the appointment."

The necessity of a proper delegation of authority and power to a committee has been recognized in other jurisdictions.

> "The Legislature has very broad discretionary power to investigate any subject respecting which it may desire information in aid of the proper discharge of its function to make or unmake written laws, or perform any other act delegated to it by the fundamental law, state or national, and to proceed, with that end in view, by a *duly authorized committee* of one or both branches of the Legislature * * *." (*State ex rel. Rosenhein v. Frear*,

138 Wis. 173 at 176 to 177, 119 N.W. 894 at 895 (1909).) (Emphasis added.)

The delegation requirement was eloquently set forth in *Asp, Inc. v. Capital Bank and Trust Co., supra,* at 813:

> "It is universally recognized that with the power to legislate there is inherent in the Legislature the power to conduct investigations, and that these investigations should be conducted solely as an aid to its consideration and determination of prospective legislation. The right of inquiry and investigation may be exercised by it as a body of the whole legislature, or the Legislature may *delegate its investigative powers to a committee* of less than the whole of the Legislature." (Emphasis added.)

It is important to note that the above quotation explicitly recognizes that the investigative power is that of the *legislative body.*

■■ The defendant cited the Illinois case of *DuBois v. Gibbons, supra,* as authority for his position that standing committees can conduct investigations on their own initiative. The *DuBois* case involved the constitutionality of a statute of Illinois and an ordinance of the city of Chicago. The statute gave municipalities of more than 500,000 population "the power to investigate the enforcement of the municipal ordinances, rules and regulations, and the action, conduct and efficiency of all officers, agents and employees of the municipality." (*DuBois, supra,* at 398.) The ordinance created the emergency committee on crime of the city council of the city of Chicago pursuant to the authority granted by the State statute. The court recognized the power and authority of the legislative bodies to conduct investigations via committees but the case does not hold and does not stand for the proposition that committees can investigate on their own initiative. The proper delegation of authority and power was present in *DuBois.* When read correctly, the *DuBois* case is consistent with our holding here that the inherent power possessed by the Illinois General Assembly to conduct legislative investigations must be properly delegated to a committee in order for it to pursue such an investigation or make a further delegation to a subcommittee so that it can conduct the legislative investigation. The committees of the Illinois House of Representatives can only exercise the authority and power that has been properly and lawfully delegated to them by the legislative body in which the authority and power is reposed.

The defendant has also referred to certain statutes concerning the General Assembly (Ill. Rev. Stat. 1971, ch. 63, par. 4 and par. 6) and contends that they give standing committees the complete authority to investigate on their own. The statutes read:

> "The presiding officer of each house, and the chairman, or any

member of any committee appointed by either house, or of a joint committee appointed by the two houses of the General Assembly, may administer oaths and affirmations to witnesses called before such house or committee for the purpose of giving evidence touching any matter or thing which may be under the consideration or investigation of such house or committee.

\* \* \*

Any person may be compelled, by subpoena, to appear and give testimony as a witness, and produce papers and documents before either house or a committee thereof, or a joint committee of both houses. \* \* \*"

A careful examination of these statutes reveals that they do not give standing committees of the General Assembly authority and power to conduct legislative investigations on their own initiative. These statutes provide the means whereby the authority and power to conduct legislative investigations can be implemented effectively once it is properly undertaken by either house of the General Assembly or the proper delegation of authority and power has been given to a committee. The function of these statutes was recognized in the *DuBois case* (2 Ill.2d 392) on which the defendant so heavily relied. It was there stated:

"Provisions *for the exercise of investigative powers* by the General Assembly of this State and its committees have been on the statute books for over eighty years. (Ill. Rev. Stat. 1953, chap. 63, pars. 4, 6, 7, 8, 9 and 10.)" (*DuBois, supra*, at 413.) (Emphasis added.)

These provisions are a logical extension of the inherent legislative power to investigate because without the effective means to implement the power to conduct legislative investigations such power would be rendered nugatory.

We find the defendant's contention that the Illinois Constitution of 1970 authorizes investigatory activities by legislative committees equally without merit. The authority relied upon by the defendant for this proposition is article IV, section 7(c) of the Constitution of 1970. It provides:

"Either house or any committee thereof as provided by law may compel by subpoena the attendance and testimony of witnesses and the production of books, records and papers."

The import of this section of the constitution is similar to that of the statutes previously discussed. Section 7(c) of article IV provides the means for effective implementation of the authority and power to conduct legislative investigation. As stated in the Constitutional Commentary in the Smith-Hurd Annotated Statutes, "It [section 7(c)] provides either house and any of their committees with *Constitutional support* for

investigatory action undertaken pursuant to a legislative function." (Emphasis added.) This section of the Constitution of 1970 does not transmit the inherent investigatory power of the Illinois General Assembly to the committee system and without a proper delegation the standing committees have no authority and power to conduct legislative investigations.

Before discussing the final two issues raised by the defendant, we feel it necessary to comment briefly upon a point raised in the defendant's reply brief. The defendant referred to the fact that the House of Representatives of the 78th General Assembly adopted rule 14 by which it created a number of standing committees and gave them descriptive names such as "Agriculture and Natural Resources", "Appropriations", and "Executive Committee." The defendant stated:

> "Hence when the House created these standing committees with their descriptive titles—descriptive of their authority—it thereby delegated to each of them the power to consider all those matters with which they were specifically concerned and which normally come within the purview of legislative functions."

It would seem that this statement concedes the fact that a delegation of authority and power is necessary but ignoring this, it is untenable that the mere designation of a standing committee by some appropriate label could constitute the proper and lawful delegation of the inherent authority and power to conduct a legislative investigation. A more specific and definite authorization than merely creating a standing committee denominated as the "Executive Committee" is obviously necessary.

■■ The final contentions of the defendant are that the findings of the trial court lack any evidentiary or legal basis and that this case must be viewed in light of the principle that legislative actions are presumed to be legal and valid. It is true that a presumption of legality and validity attaches to legislative actions but it is not an irrebuttable presumption and can be overcome by competent evidence. As we previously stated, the salient inquiry in the case at bar must be whether a subcommittee of the Executive Committee had the authority and power to conduct the legislative investigation and subpoena the plaintiff to appear and testify before it. The trial court found that a standing committee of the House of Representatives, without a resolution of the House of Representatives can only conduct an investigation with regard to bills or resolutions pending before it. We agree with the trial court.

The affidavit of Mr. Selcke introduced by the plaintiff at the hearing before the trial court clearly establishes that there was no resolution of any kind adopted by the House of Representatives creating an investigative subcommittee with power to investigate the Illinois Liquor Control

Commission. Therefore, it is necessary to seek another possible source of the requisite delegation of authority and power to conduct the legislative investigation. We deem it unnecessary to consider the Speaker of the House of Representatives because as the defendant correctly stated he did not create the subcommittee here in question. After a perusal of the House of Representatives' rules for the 78th General Assembly, the statutes and constitutional provision previously cited, we find that the only possible source of the requisite delegation of authority and power to conduct the legislative investigation is rule 23 of the House rules. The trial court focused its attention on this rule and found that it did not expressly or by necessary implication authorize the Chairman of the Executive Committee to create an investigative committee except in consideration of a bill or resolution pending before the Committee. We agree.

The House of Representatives' rule 23 states: "(a) Each committee shall consider the bills and resolutions referred to it and report one of the following recommendations to the House. * * *" It is evident that this rule does not authorize a standing committee to conduct a legislative investigation except when a bill or resolution has been referred to it. As the trial court stated, "That is the limit of the authority of the committee. Consider the bills and resolutions referred to it and report one of the following recommendations to the House." The trial court specifically referred to the fact that either the Senate or the House of Representatives can pass a separate resolution authorizing a committee to conduct a legislative investigation or that a joint resolution can create a joint committee to investigate but as previously alluded to, no such resolution, separate or joint, had been adopted in this case. Therefore, no authorization existed for the Executive Committee of the House of Representatives or a subcommittee thereof to conduct a legislative investigation.

The defendant in support of his contention that the trial court's findings lack any evidentiary or legal basis has referred to what he calls a "customary rule of procedure" of the House of Representatives by which it has recognized and adhered to the practice that standing committees have investigative powers even though no specific bill or resolution is pending before them. Defendant also stated that there are a number of subcommittees presently operating as part of the 78th General Assembly without a bill or resolution pending before them and that no objections have been raised. We find this so-called "customary rule of procedure" unpersuasive. As was stated in *Fergus v. Russel*, 270 Ill. 304, at 346, "The long indulgence in this custom cannot create a right in the legislature, or either house thereof, to do that which it has no power or author-

ity to do." Although the court in *Fergus* was referring to the practice of the Illinois legislature to appoint committees to act after the legislative session had ended, its statement is equally applicable to the so-called "customary rule of procedure" to which the defendant has referred. A custom cannot create jurisdiction where none exists.

The defendant has made the doomsday prediction that if the findings and order of the trial court are affirmed the very operation of the legislative branch of government will be threatened. However, the trial court's ruling and our decision only require that the inherent power possessed by the *General Assembly* to conduct legislative investigations must be properly and lawfully delegated before a standing committee or subcommittee thereof can conduct such a legislative investigation. If the two Houses of our General Assembly decide that there are any deficiencies in their rules they can rectify the situation pursuant to their constitutional rule-making power. *See* Ill. Const. 1970, art. IV, sec. 6(d).

■■ This court is cognizant of the fact that with the privilege of citizenship in the State of Illinois come certain duties. One of those duties is to appear and testify when summoned before our State Legislature and its committees and subcommittees. It is obvious that without such a requirement our legislature would be seriously hampered and incapable of functioning effectively. However, the public duty to appear and testify only attaches when an individual is *properly* summoned. The plaintiff in the case at bar was not *properly* summoned because the purported subcommittee of the Executive Committee of the House of Representatives had not received the requisite delegation of authority and power to conduct a legislative investigation and therefore, it had no power to issue a subpoena to the plaintiff. To require the plaintiff to testify under these circumstances would violate his constitutional right of due process of law.

For the reasons herein stated the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

DIERINGER and JOHNSON, JJ., concur.